Milligan, J.,
delivered the opinion of the Court.
This is a hill brought by the complainant, Wood-fork, in the Chancery Court at Nashville, against the corporation known as the “Union Bank of Tennessee,” and its President and Directors, individually. The bill alleges that the complainant is the owner of three hundred and eighty-nine shares of the capital stock of the corporation, known in law as “ The President, Directors and Company of the Union Bank of the State of Tennessee;” and that the corporation, styled “ The Union Bank of Tennessee,” and its officers, *490 have wrongfully converted his contributions to the former organization, and he now seeks to hold the latter, and its President and Directors, individually responsible for his stock, together with such profits as might have accrued to him in the due course of business, under the organization to which he contributed his capital.
In October, 1832, “ The Union Bank of Tennessee” was first chartered, under the corporate name of “The President, Directors and Company of the Union Bank of the State of Tennessee,” to continue in existence until the 1st of January, 1863, and no longer. The principal place of business was, by the charter, established at Nashville, and the capital stock was limited to three millions. Shortly after the passage of its charter, the bank was organized and went into successful operation. The complainant’s stock constituted a part of its capital, and he, in common with the other stockholders, enjoyed all the advantages of the corporation, and was in turn responsible, as a corporator, for its liabilities.
On the 6th of February, 1860, the Legislature of the State passed An Act, commonly known as “ The Bank Code,” in which it is declared “that every bank which now is, or may hereafter be, incorporated under the authority of the State, shall be subject to the liabilities, and governed by the rules and provisions contained in this Act.” On the 1st of March, thereafter, 1860, the Legislature passed An Act to incorporate the capital stock of the Union and Planters’ Bank, in which it is enacted, “ that the *491 President, Directors and Company of tire Union Bank of the State of Tennessee, and the Planters’ Bank of Tennessee, be bodies politic and corporate, until the 1st day of January, 1878, with all the powers, privileges, duties and obligations, and subject to all the stipulations and provisions of the Acts passed the 18th day of October, 1832, and the 15th day of November, 1832, chartering said banks, and the Acts amendatory thereto, as now binding on each respectively, except so far as the same are altered, repealed or modified by An Act passed on the 6th of February, 1860, styled £ An Act to reform and regulate the business of banking in Tennessee,’ to which said charters are subject; and that the existing stockholders of said corporation respectively, (or those who shall be such at the time of acceptance,) shall have until the 1st day of October, 1860, to accept this charter.”
On the 2d of July, 1860, a large majority of the stockholders of the bank, under a call of its officers, and a notice of the time and place published in the city newspapers, assembled, in person and by proxy, in the banking house in Nashville, to ascertain, by an election, whether or not they would accept the Act of the Legislature, passed on the 1st of March, 1860. The election appears to have been properly conducted, and the result, as officially declared, shows that 9,009 shares of the capital stock were represented, which, under the charter, entitled the stockholders present and representing the same, to 894 votes, of which 858 were cast in favor of the acceptance, and 36 *492 against it. The complainant was present, and voted against the acceptance.
Under this state of facts, the complainant charges, that, before the adoption of the Acts amendatory of the old charter, the bant was suffering heavy losses; and that on the 1st of October, 1860, the time limited by the Act of the 6th of February, 1850, for its acceptance, the old corporation ceased to exist, and the new, under the action of a majority of the stockholders, sprung into being; that he was a member of the former, but has no interest or connection with the latter; and that the transfer of his stock from the old to the new organization, against his vote and will, was illegal, and a wrongful con-versón of it from the date of the stockholders’ acceptance of the extending Act of 1860; and for which the new corporation, as well as its officers, the President and Directors, are individually liable to account with him, not only for the safety of his stock, but for such profits as might have been realized from it in banking under the original charter, up to the time of its acceptance, on the 1st of January, 1863.
The legal consequences, as it is insisted on in the bill, flow from the fact, that the complainant had, by virtue of his contributions to the capital stock, a right to have the bank carried on under the original charter, without material alteration or modification, until its expiration; and that right has been defeated, by the acceptance of the Act of March 1, 1860, which has worked such changes in the original charter, as, in the language of the bill, “the liabilities, rules, and *493 provisions, are not the same as those prescribed in the charter, which created the corporate body styled, cThe President, Directors and Company of the Union Bank of the State of Tennessee,’ in which complainant is a stockholder.” “On the contrary,” the bill continues, “such liabilities, rules, and provisions, are, in some respects, more onerous, stringent, and critical, than those prescribed in the charter aforesaid, while, in other respects, the funds contributed by the stockholder are not as safely guarded as by the said charter, and are to be trusted to the management of persons not owning stock.”
The bank answers at great length, and the President and Directors, who are made party defendants, respectfully adopt the answer of the corporation. The allegations in the bill, with respect to the organization of the bank under the original charter — the passage of the Acts of February 6, and March 1, 1860, and the acceptance of the latter by a majority of the stockholders — are all substantially admitted as charged. But the charge in the bill, “that since the 1st of October, 1860, the corporation, known as ‘ The President, Directors and Company of the Union Bank of the State of Tennessee,’ has ceased to exist, in law and in fact, and that it has been succeeded by the corporation styled, ‘ The President and Directors of the Union Bank of Tennessee,’ with a charter consisting of a combination of the Acts of October 18, 1832, February 6, and March 1, 1860,” are substantially denied. The change in the name of the corporation, is admitted; but, it is insisted, the corporation is the same, *494 and that its existence has never been suspended or superseded, from the time of its organization up to the date of filing the answer, in November, 1860; that the charter of 1832, has not expired by its own limitation, nor has it been surrendered or forfeited, but, by the acceptance of the Act of March 1, 1860, it has been extended and modified; but the modifications, as it is insisted, are not fundamental, radical, or vital.
The right of the complainant to recover the lawful dividends arising on his stock, whenever the same shall be declared as heretofore, and his share of the capital stock, with the profits, if any, accruing thereon, whenever the legal existence of the corporation shall be terminated, is not controverted; but it is denied that the complainant has any authority to withdraw his stock from the corporation, before the expiration of the charter, either as originally limited, or subsequently extended.
No proof was taken on either side, and the cause was heard upon bill and answer, with the exhibits therewith filed. The Chancellor dismissed the bill, and the complainant appealed in error to this Court.
Under this state of facts, various interesting questions are presented in argument; but they may all be properly resolved into two, which, with their necessary incidents, we think, are decisive of this case. The first arises at the threshold, and upon its decision mainly depends the necessity of investigating the second.
1st, It is insisted that the bill was prematurely filed, and that it discloses no equities, of which the complainant could, at the time, avail himself.
*495 2nd, That the changes worked by the acceptance of the Act of March 1st, 1860, are merely regulatory, and not fundamental and radical, and that their adoption by a majority of the stockholders, makes them binding on the whole.
The bill was filed on the 29th of October, 1860, more than two years before the charter of 1882' expired by its own limitation. It fails to allege any gross negligence or willful departure of the defendants from the discharge of the duties or trusts imposed upon them by the original charter, or specifically to indicate the fundamental or radical changes worked in it, by the acceptance of the Act of March 1st, 1860. The whole equity of the bill is predicated on the fact, that a majority of the stockholders, on the 2d of July, 1860, by accepting the Act of March 1st, 1860, contrary to the expressed will and vote of the - complainant, terminated, in law and in fact, the existence of the corporation known as “The President, Directors and Company of the Union Bank of the State of Tennessee;” and after the 1st of October, 1860, the time limited for the acceptance of this Act, another and different organization, under the corporate name of “The President and Directors of_ the Union Bank of Tennessee,” took its place, with chartered privileges, in some respects more onerous, stringent and radical, than those conferred by the original charter.
The alleged equity in the bill is directly met in the answer. The language of the answer is: “Despondent admits that the complainant is the owner of said shares of the capital stock, and is entitled to all *496 the rights, profits and emoluments .appertaining to the same, which were secured by the charter to other stockholders; and that among said rights, is the right to have said bank carried on under the charter” till the first day of January, 1863; “and respondent states, that the said bank is being carried on since the first of October, 1860, and will continue to be carried on until the first day of January, 1863, under the charter.”
Here is an issue of fact, which is vital to the whole case. No proof is taken on either side, by which the Court is enabled to determine the truth of the conflicting statements in the bill and answer. The bill elsewhere does not disclose the existence of such facts as even tend to show that the old charter has been abandoned, surrendered or forfeited; but, on the contrary, it is distinctly alleged, that, after the acceptance of the Act of March 1, 1860, the charter of the bank consisted of a combination of the old charter of 1832, Acts of February 6, and March 1, 1860, which so changed the provisions of the old charter, as, in some respects, to make them more onerous and stringent upon the stockholders. But no where is it even charged in the bill, that the President and Directors, in their administration of the affairs of the corporation, have done anything not authorized by the original charter, or omitted to do what it enjoins. It is not even alleged that they have organized under the “new charter,” or reduced the number of Directors to the requirements of the Act of March 1, 1860, Nor is there anything in the answer which materially *497 aids the defective allegations in the hill. We are left, therefore, to decide this issue' by the rules of law, which, in the absence of all proof, govern in similar cases. It is a well settled principle in Chancery practice, that the matter of the hill cannot he decreed against the answer, upon the unsupported testimony of one witness, much less where there is no witness at all, or corroborating fact or circumstances in aid of the allegations of the bill: Baker vs. Barfield, 4 Hum., 514; 2 Story’s Eq., sec. 1528. This rule, however, applies, if at all, with less stringency in cases of denial by a corporation, than of an individual. In the former case, the answer is under the seal of the corporation, and oath is not opposed to oath as in the latter, and thereby creating the reason for two witnesses to support the matter of the bill. But a denial of the allegations of the bill by a corporation, under its corporate seal, nevertheless, creates an issue, which, before a decree can be pronounced in favor of the matter of the bill, must be decided by testimony of at least one witness, or corroborating circumstances equivalent thereto, in support, of the bill. Van Wyck vs. Norvell, 2 Hum., 192-198.
But the answer of the corporation is adopted by the answers of the individual defendants, which are, respectively, filed under the oath of the parties; and there is, therefore, no reason or authority, why, in this case, there should be any relaxation of the ordinary rule.
The answer, it is true, as before shown, admits the acceptance of the Act of March 1, 1860, by a ma *498 jority of the stockholders, but it does not follow, that thereby the franchises granted by the Act of 1832, were terminated, or" that the corporation previously organized, ceased to exist. The charter of a private corporation is in the nature of a special contract, and when once granted by the State, and accepted by the corporators, the Legislature has no constitutional power to take away, or impair the exercise of any of the essential franchises previously granted: Trustees of Dartmouth College vs. Woodward, 4 Wheaton’s R., 468; Redfield on Railways, sections 70, 7, and 231; Union Lock & Canal Company vs. Towne, 1 Hum., 44.
The acceptance of the Act of March 1, 1860, which, in terms, imposes upon the corporation the necessity of subjecting its action to the provisions of the “Bank Code,” could not, if the changes in the charter thus wrought were even radical and fundamental, have the effect, ipso facto, of defeating the right of the corpo-rators to continue their organization under the original charter, up to the time of its expiration. The contract, or charter, after acceptance, is inviolable between the State and the corporation, as it is, also, between the corporation and stockholders. Neither the one nor the other, can disregard its obligations, or alter its essential franchises, without the unanimous concurrence of the stockholders. A corporation already in being, and acting either under a former charter, or prescriptive usage, which accepts a new charter, before the expiration of the old, may still act under the former, or partly under the one and partly under the other: *499 Rex vs. Cambridge, 3 Burr., 1656-1663; Ang. & Ames on Corp., 650. In this respect, there is a vast difference between an original charter granted to a new corporation, and a new charter granted to an old corporation. In the .former case, the charter must be accepted in toto, or not at all; but in the latter, the corporation may act partly under both the new and the old charters. In the King vs. Passmore, 3 T. R., 246, Lord Kenyon says: “That an existing corporation cannot have another charter obtruded upon it by the Crown. It may reject it, or accept the whole or any part of the new charter.” The reason is obvious. A charter is a contract, to the validity of which the consent of both parties is essential, and therefore, it cannot be altered or added to, without such consent.
On the other hand, the State possesses over all corporations, a sort of regulatory power, by which the Legislature may, if the corporation be a public corporation, under proper limitations, change, modify, enlarge or restrain its franchises, securing, however, at all times, the property to the use of those for whom it was purchased: Ang. & Ames on Corporations, 650-1; Dartmouth College vs. Woodward, 4 Wheat., 463; 2 Kent’s Com., 352. But if it be a private corporation, whether civil or eleemosynary, which, in the great case of Dartmouth College vs. Woodward, has been held to be an executed contract; and within the meaning of the tenth section of article first of the Constitution of the United States, the Legislature cannot do more than pass such amendments to the charter as are merely ancillary to the main design of the corpo *500 ration. It cannot repeal, impair, or alter tlie rights and privileges conferred by the charter, against the consent, and without the default, of the corporation, judicially ascertained and declared: 2 Kent’s Com., 352; Redfield on Railways, sec. 56, sub-sec. 7, and note; also Stephens vs. Rutland & Burlington Railway, 1 Law Rep., 154. In such case, if the alterations pro- • posed in the charter of a private corporation, by legislative enactment, are merely auxiliary and not fundamental, they may be accepted by a majority of the corporators; and, when so assented to, they are binding on the whole; but it is otherwise, as we have already shown, when the alterations are fundamental, radical, and vital — the acceptance must then be unanimous. It follows, therefore, in either event, that the acceptance of the Act of March 1, 1860, by a majority of the stockholders, did not dissolve the corporation, or in any way prohibit it from exercising any of the franchises conferred upon it by the charter of 1832, for the remainder of the term. And so long as the action of the corporation, in the administration of the trusts imposed upon it, was limited to the scope of the original charter, notwithstanding the acceptance of the Act of March 1, 1860, the complainant could ’ have no just grounds upon which to sustain this bill. The organization, with all its chartered privileges, to which he contributed his stock in contemplation of law, remained unimpaired, and the courts of equity at all times, stood open to him, through which, at any moment, he could, by injunction, have restrained the directory, or a majority of the stockholders, from any *501 violation of the original charter, or from the misapplication of his capital stock, or the legitimate profits arising therefrom: Dodge vs. Woolsey, 18 Howard, 331-341, and authorities there cited.
But he complains of no violation of the charter, or practical departure from its original purposes; no fraudulent appropriation of the stock, or misapplication of the lawful dividends; hut insists that the old corporation has been suspended by the new one, with provisions more onerous and stringent than the old? and that his stock, subscribed to the former, has been converted by the latter; and, therefore, he asks the interposition of a court of equity, to enable him to withdraw his stock, with the dividends that might have accrued upon it, under a just administration of the franchises of the old charter. How this can lawfully bé accomplished, even in the absence of the direct denial of the allegation in the bill by the defendants, we are at a loss to understand. The stock of a banking corporation, is, by every principle of law as well as common sense, not the absolute property of the individual shareholders. It has uniformly been deemed a pledge or trust fund, for the payment of the debts of the bank.. The public, as well as the Legislature granting the charter, view it in no other light. Eor this reason, the charter, in this case, as well as most other joint stock corporations, relieve the individual stockholders from personal responsibility, and substitute this fund in its place. To it alone, credit is almost universally given, as the only means of the corporation for re-payment. During the existence of the *502 corporation, it belongs solely to the corporation, and may be applied under the restrictions of the charter. The residuum, after meeting all demands upon it, and not the stock itself, belongs to the shareholders; and this can never be justly ascertained until the business of the corporation is wound up, and a fair and equitable disposition of the entire assets, made among all the parties entitled thereto: Ang. & Ames on Cor., 474-476.
Under such circumstances, a court of equity would be slow to interpose in behalf of the complainant; and would not do so, unless it was made clearly to appear, that it could pronounce a decree rendering equal and impartial justice to all parties equitably interested in the capital stock. To allow one stockholder, during the existence of the corporation, to withdraw his stock before the business of the corporation is wound up, and its liabilities ascertained and discharged, would be to recognize the right in all others, who, from interest or caprice, might feel themselves justified in making a similar demand. Such a doctrine would present the strongest incentive to fraud and perjury,, and involve the corporation itself in interminable dissensions and litigation, which, in a failing or unsuccessful business, would defeat the ends of all justice. And all this, when the appropriate remedy by injunction is ample and effectual, in almost every imaginable case arising between the corporation and the stockholders. This remedy operates to sustain the corporation, not to dissolve it; to uphold the contract, not to violate it; to protect the *503 corporate funds, and apply them with fidelity to the trust for which they are held under the articles of the charter; and not to withdraw them during the existence of the corporation, and turn them over to the stockholders at the expense 'of the creditors who have generously trusted their capital ■ to the good faith of the institution.
In this view of the law, as applicable to this case, we deem it unnecessary to enter further upon the investigation of the second proposition. The principles of law already declared, we think conclusive of the rights of the parties, as presented in the pleadings:
1. The controlling equity, as alleged in the bill, is denied in the answer, and no proof is offered to sustain the equity of the bill.
2. None of the essential franchises of the corporation, granted by the original charter in 1832, during the existence of the term to which it was limited, could be materially altered, changed, modified, or repealed by any subsequent Act of the Legislature, without the unanimous consent of the stockholders; and, consequently, no esseritial right, secured to the corporation under the original charter, could be im- • paired by the acceptance of the Act of March 1, 1860, by any majority of the stockholders, however large.
3. The appropriate remedy of the complainant, or other dissentient shareholder, was, to restrain the corporation from all illegal departures from the essential articles of the constitution of the corporation by in *504 junction, and not by a bill for a conversion of his stock, and an account for its value at a given time, with the profits which has accrued thereon, brought before the dissolution of the corporation by the limitation of the charter, the default of its officers, or some other lawful mode judicially ascertained and declared, and all the trusts imposed upon the capital stock ascertained and discharged.
4. The record fails to disclose the facts necessary to charge the defendants with such a departure from the scope of the original charter, after the acceptance of the Act of March 1, 1860, as would justify a court of equity in interposing, by injunction, to restrain the corporation from a violation of any of the essential franchises of the original charter; or by bill to hold its officers individually responsible for a faithless discharge of their duties, imposed upon them by the original charter.
There is, therefore, no error in the decree of the Chancellor dismissing the bill; and we confirm it with costs.